# EXHIBIT E

**EXPERT REPORT OF REBECCA E. KUEHN**

In the matter of Thomas Black v. General Information Solutions LLC

July 21, 2017

## I.    INTRODUCTION.

My name is Rebecca E. Kuehn, an attorney focusing on consumer financial services and consumer protection matters in the Washington, D.C. office of Hudson Cook, LLP.  I have prepared this expert report at the request of the General Information Solutions LLC ("GIS"), which has sought my expert analysis regarding the standards and practices of the consumer reporting industry, specifically consumer reporting agencies engaged in employment background screening.  I have used that expertise to analyze and report on GIS's policies and procedures to assure maximum possible accuracy of consumer reports that it provides to employers and that the public records information contained within such reports is complete and up to date, its oversight of its vendors, and in particular Wholesale Screening Solutions, LLC ("Wholesale"), in the preparation and sale of consumer reports, and the application of the Fair Credit Reporting Act ("FCRA") to these activities.  I also have been asked to provide specific rebuttal testimony in response to Plaintiff's proffered expert witness, Evan Hendricks.

As set forth more fully below, based on my extensive knowledge of and experience with consumer reporting agencies engaged in the preparation of consumer reports containing public records, my expert opinion is that the policies and procedures in place at GIS to ensure maximum possible accuracy and to oversee vendors are consistent with industry standards and practices, consistent with the experience and understanding I obtained during my tenure at the Federal Trade Commission ("FTC"), and otherwise reasonable based on my knowledge of the industry.  In my discussion below, I offer specific rebuttal to the testimony of Mr. Hendricks.[1]

## II.    EXPERT QUALIFICATIONS.

I am an expert in the policies, procedures, and practices that consumer reporting agencies ("CRAs") use to ensure compliance with the FCRA.  I developed this expertise through substantial experience in the industry, advising CRAs, lenders, and other users of consumer reports on the development of procedures designed to comply with the FCRA.  I also gained expertise and insight into the practices of the industry through my work at the FTC, which is a federal agency tasked with the enforcement of the FCRA (as discussed more fully herein).

In all, I have nearly two decades of experience in advising companies, consumers, industry, and policymakers on the FCRA and its requirements.  Beginning in 1997, with the advent of litigation against credit furnishers following the 1996 amendments to the FCRA, I defended banks and other financial institutions against claims asserting violations of the

---

[1]    In forming my opinions, I have become aware and gained a complete understanding of the facts and allegations involved in the present case.  The materials I reviewed in this regard are listed in Exhibit A.  My report often references these sources where helpful and appropriate; however, I have reviewed all of the materials listed on Exhibit A, and the absence of any specific reference does not mean that I did not consider it in forming a particular opinion or making any particular statement.

reinvestigation provisions of the FCRA.  My practice expanded to include litigation and counseling matters involving CRAs and public records vendors that retrieve records for use by CRAs.  Through this work, I developed an expertise in the FCRA, which led to my move to the FTC.

In May 2006, I was appointed Assistant Director in the Division of Privacy and Identity Protection at the FTC.  That division oversees issues related to consumer privacy, consumer reporting, identity theft, and information security.  In that role with the FTC, I led the FCRA program and oversaw the FTC's enforcement, outreach, and rulemaking activities in that area.  I regularly coordinated with federal financial agencies in developing, issuing, and interpreting interagency rules, such as the Affiliate Marketing Rule, the Risk Based Pricing Rule, the Accuracy and Direct Disputes Rules, and amendments to the Gramm-Leach-Bliley Privacy Rule.

During my tenure at the FTC, I also supervised a number of investigations involving employment and tenant screening companies, some of which resulted in cases brought by the FTC.[2]  My experience in this regard is broad, and specifically includes involvement in issues relating to the accuracy of public records.  My work at the FTC also included oversight and participation in the development of education about the use of consumer reports in tenant and employment screening.[3]  In addition, I oversaw the development and issuance of the FTC staff report, *40 Years of Experience with the Fair Credit Reporting Act:  An FTC Staff Report with Summary of Interpretations* ("40 Years Report")   The 40 Years Report, issued in July 2011, is a compilation of FTC staff guidance and incorporates much of the FTC's prior "Commentary" (published in 1990).  The 40 Years Report is relied upon by government and industry as an authoritative source on the FCRA.

Building on my knowledge and understanding of the consumer reporting industry in this country, my work at the FTC additionally supported global credit reporting initiatives.  For example, in 2007, while at the FTC, I was selected to work with the U.S. Agency for International Development (known as "USAID") to provide technical assistance to the Central Bank of Egypt in the development of regulations and oversight over credit bureaus.  I worked with representatives of the Central Bank to provide them insight into the FCRA and oversight over credit bureaus in the United States.  I also served as the FTC's representative to the World Bank Task Force on Credit Reporting.  This international Task Force worked to develop an agreed framework in the form of international standards for credit reporting systems' policy

---

[2]   *See, e.g., United States v. Rental Research Services, Inc., et al.*, available at https://www.ftc.gov/enforcement/cases-proceedings/072-3228/rental-research-services-inc-corporation-et-al-united-states; *United States v. First Advantage SafeRent, Inc., et al.,* available at https://www.ftc.gov/enforcement/cases-proceedings/082-3016/first-advantage-saferent-inc-et-al-usa-ftc.

[3]   In my role as Assistant Director, I spoke at a number of industry conferences about the work of the FTC and the requirements of the FCRA.  A selected list of presentations is included in Exhibits B and C.

and oversight.  This work culminated in a report, *General Principles for Credit Reporting*, issued September 2011.[4]

From September 2011 through April 2015, I served as Vice President and Senior Regulatory Counsel for CoreLogic, Inc., which is a leading provider of consumer, financial and other information, analytics and services to business and government.  In that capacity, I was the lead lawyer and coverage counsel for CoreLogic's credit reporting and consumer data businesses, which included a tenant screening company, a credit report reseller, and a CRA that provides reports in the short-term lending market.  CoreLogic also is a public records vendor, and obtains, normalizes, and licenses public record data of different types, including data on real estate transactions, criminal records, and tenant history data.

In my role as counsel to CoreLogic, I worked with operations and compliance personnel to develop and revise policies, procedures, and standards related to ensuring maximum possible accuracy and to otherwise comply with the FCRA, both in the sale of reports containing criminal records data and other public records, as well as credit reports obtained from the three nationwide consumer reporting agencies and resold through CoreLogic's reseller entities.  I also worked on policy issues related to access to public records.  I provided advice and guidance to management on a wide variety of consumer data and privacy-related regulatory issues, including the FCRA and Gramm-Leach-Bliley Act.

I am currently a partner at the law firm Hudson Cook, LLP, a leading firm in consumer financial services law and compliance.  I joined the firm's Washington, D.C. office in April 2015. At Hudson Cook, I work with financial institutions and consumer reporting clients of different sizes that I advise on legal compliance matters.  My practice is focused on consumer privacy and consumer reporting issues.   I regularly provide advice and representation to businesses involved in the consumer reporting industry, including CRAs, users of consumer reports (*e.g.*, automotive finance companies), and furnishers of information to CRAs (*e.g.*, credit card companies).  I also advise trade associations in the consumer reporting industry, including the National Association of Professional Background Screeners, which is a trade association consisting of employment and tenant screening companies.

I am an active member of the Consumer Financial Services Committee, which is part of the American Bar Association's Section of Business Law.  For the past several years, I have taught new attorneys about the Fair Credit Reporting Act as part of the ABA's National Institute on Consumer Financial Services Law.  I am the chair of this year's National Institute.  I regularly monitor the case law, industry developments, and government activities relating to the FCRA

---

[4]    *See* The World Bank, "General Principles for Credit Reporting" (Sept. 2011), *available at* http://siteresources.worldbank.org/FINANCIALSECTOR/Resources/Credit_Reporting_text.pdf (last visited 7/19/17).

and matters of consumer data privacy more generally.  I speak frequently at industry and legal conferences on FCRA and other financial services and privacy topics.  I have been participating as an Observer in the Uniform Law Commission's drafting committee on criminal records accuracy.

The publications I have authored in the past 10 years are listed on Exhibit B, which is attached to my Report.  With respect to prior expert witness testimony, I qualified and testified as an expert in October 2016 at a preliminary hearing in an arbitration proceeding.  The arbitration proceeding is confidential.

I hold a Bachelor of Arts degree (*summa cum laude)* from Frostburg State University and a Juris Doctor (*with high honors*) degree from the National Law Center at George Washington University.  I am a member of the Virginia, Maryland, and District of Columbia bars.

A copy of my resume is appended hereto as Exhibit C, which also contains a list of selected presentations that I have given.

I am being compensated at a rate of $780 per hour for my work in this matter

## III.    NATURE AND REGULATION OF THE CONSUMER REPORTING INDUSTRY.

### A.    The Fair Credit Reporting Act.

Enacted in 1970, the Fair Credit Reporting Act—or FCRA—governs the collection, assembly, and use of consumer report information and provides the framework for our nation's consumer reporting system.  Its purposes are (1) to protect consumers by preventing the misuse of their sensitive personal information and improving the accuracy of consumer report information; and (2) to promote the efficiency of the nation's banking and consumer credit systems.[5]  The FCRA is a complex statute, which Congress has amended a number of times in many significant respects.  The FCRA's requirements govern all aspects of consumer reporting, an industry that has changed significantly since the statute's original passage.  As the Supreme Court has observed, the FCRA is a "less-than-pellucid" statute[6] and sets forth a number of responsibilities for CRAs and others, some highly technical.  It contains no fewer than 31 separate sections, 145 subsections, and approximately 34,000 words.

The FCRA regulates the practices of the three principal groups involved in the consumer reporting system:  (1) CRAs, which include credit bureaus, tenant screening companies, and background screening companies; (2) furnishers of consumer report information to the CRAs; and (3) users of consumer reports.  CRAs collect and compile consumer information into

---

[5]    40 Years Report at 1.
[6]    *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007).

consumer reports and provide them to authorized users—for example, landlords, property managers, credit grantors, insurance companies, and employers—that make eligibility decisions about those consumers.  Information included in employment background screening consumer reports may include the consumer's credit history, employment history and reference verifications, as well as demographic, identifying, and other public record information (*e.g.*, criminal records).

In enacting the FCRA, Congress recognized the value of the consumer reporting industry, finding that CRAs "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers."[7]  The FCRA "seeks to balance the needs of consumers and businesses" with respect to the use of consumer information.[8]

The primary enforcement agency for the FCRA since its enactment in 1970 has been the FTC.  The FTC has brought over one hundred enforcement actions for asserted violations of the FCRA.[9]  In addition, although it has only limited formal rulemaking authority, the FTC has offered extensive interpretations and guidance on the FCRA over the years, including issuing over 430 opinion letters and eight formal interpretations, as well as publishing a compliance manual and other educational tools for businesses.  With the passage for the Dodd-Frank Act, the Consumer Financial Protection Bureau ("CFPB") and FTC now have concurrent FCRA enforcement authority over non-depository institutions.  With respect to banks and other depository institutions, which are exempt from FTC authority, the CFPB shares jurisdiction with the federal bank regulatory agencies.

### B.    Reasonable Procedures to Ensure Maximum Possible Accuracy

Section 607(b) of the FCRA, 15 U.S.C. § 1681e(b), requires CRAs to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  It is critical to understand that the FCRA does not impose strict liability on CRAs with respect to the accuracy requirement, but requires only that CRAs act *reasonably*.  As the FTC staff noted, "[i]f a CRA reports an item of information that turns out to be inaccurate, it does not violate [section 607(b) of the FCRA] if it has established and followed reasonable procedures in reporting the item."[10]  Section 602(b) of the FCRA, 15 U.S.C. § 1681(b), states that "[i]t is the purpose of [the FCRA] to require that consumer reporting agencies adopt reasonable procedures … with regard to the confidentiality, accuracy, relevancy,

---

[7]    15 U.S.C. § 1681(a)(3).

[8]    S. Rep. No. 209, 103rd Cong., 2d Sess. (1993).

[9]    40 Years Report at 4; *see also* FTC's website on the FCRA: https://www.ftc.gov/tips-advice/business-center/privacy-and-security/credit-reporting (last visited 7/19/17).

[10]   40 Years Report at 67.

and proper utilization of [consumer report] information in accordance with the requirements of [the FCRA]."

The duty to follow reasonable procedures is not static.  As explained in the 40 Years Report, "when a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems."[11]  However, the duty to have reasonable procedures does not mean that a CRA must make every step to improve accuracy regardless of cost; rather, a CRA must take "steps that it can take to improve the accuracy of its reports at a reasonable cost."[12]

Much of the FCRA is focused on data provided by furnishers, which are entities that have some relationship with the consumer and are providing data to consumer reporting agencies for inclusion in a consumer report.  The CRAs have addressed the issues surrounding accuracy of information obtained from furnishers by performing background and quality control checks on would-be-furnishers, obtaining information electronically using a standardized format, and performing quality checks prior to adding the data to credit files. [13]

With respect to public records, however, the challenges are different.  Consumer reporting agencies need to obtain records from public record sources in a variety of jurisdictions with varying degrees of sophistication.  Data acquisition is a resource-intensive process, and the challenge of working with multiple jurisdictions using different terminologies has led the industry to rely on vendors that specialize on the retrieval of public records.[14]  In addition, reliance on public records research vendors by CRAs is practically unavoidable given the geographic dispersion of the records and the requirement by a number of courts that records be obtained in person.

Further, the use of vendors enables consumer reporting agencies to comply with the "strict procedures" provision of section 613 of the FCRA, 15 U.S.C. § 1681k.  Section 613 imposes additional obligations on a CRA that furnishes consumer reports for employment purposes and reports on "items of information on consumers which are matters of public record and likely to have an adverse effect upon a consumer's ability to obtain employment."[15]

---

[11]  *Id.*

[12]  *Id.*

[13]  *See* Consumer Financial Protection Bureau, *Key Dimensions and Processes in the U.S. Credit Reporting System: A review of how the nation's largest credit bureaus manage consumer data* ("Key Dimensions"), December 2012 (noting that credit bureaus has established standardized reporting formats and that they "deliver credit reporting information to users in standardized electronic formats"), at 3, 10, 14.

[14]  Key Dimensions at 17.

[15]  15 U.S.C. § 1681k(a).

In those instances, the CRA must either provide the consumer with a notice of the fact that public record information is being reported by the CRA, or must "maintain strict procedures designed to insure that whenever public record information is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date."[16]  The use of vendors enables a CRA to acquire complete and up to date public record information at the time a consumer report is ordered by an employer and to do so in a timely and cost-effective manner.

## IV.  INDUSTRY STANDARDS RELATED TO VENDOR ONBOARDING AND OVERSIGHT.

Companies may outsource certain functions due to resource constraints (such as for overflow work) or rely on expertise from vendors that would not otherwise be available without significant investment.  In the area of employment background screening, it is common to use and rely on vendors for the researching and retrieval of criminal records.  The FCRA does not specifically address the retention and use of public records vendors.  However, the background screening industry has developed standards with respect to the selection and use of vendors that are relevant here.

The National Association of Professional Background Screeners ("NAPBS") is a non-profit trade association that represents over 880 companies offering employment and tenant background screening services.  The NAPBS mission in large part is focused on promoting a high level of ethics and performance standards for the screening industry.  Accordingly, NAPBS has established rigorous accreditation standards for consumer reporting agencies offering employment background screening.

The NAPBS accreditation process, the Background Screening Agency Accreditation Program ("BSAAP"), is governed by a strict and thorough set of professional standards, which are updated to adapt to changing industry best practices.  To become accredited, a CRA must demonstrate initial and ongoing compliance with the accreditation standard as prepared by the Background Screening Credentialing Council ("BSCC").  Compliance is demonstrated through rigorous desk and on-site audits, all of which are completed by an independent third-party auditor.  A CRA must document each of its policies and processes as required in each of the areas within the BSAAP Standard and demonstrate visible compliance with the policies to the auditor.

The BSAAP accreditation lasts for five years, after which a CRA is required to recomplete the process to remain accredited.  The BSCC annually reviews all BSAAP Standards and proposes any changes in the Standard to reflect best practices in consumer reporting.  Accordingly, a company that is accredited under the BSAAP has a proven track-record of

---

[16]  *Id.*

consistently updating and reviewing its policies and procedures to meet industry best practices, specifically with regard to vendor onboarding and vendor management.

Of note, to obtain accreditation, the BSAAP requires that CRAs achieve and maintain certain standards with respect to the use of public records vendors:

Signed agreement:  To be accredited, a CRA must require a signed agreement from all non-employee public record researchers.  The agreement shall clearly outline the scope of services agreed to by CRA and researcher, including jurisdictions covered, search methodology, depth of search, disclosure of findings, methodology and time frame for communication and completion of requests, methodology for confirming identity of subject of record(s), confidentiality requirements, and reinvestigation requirements.

Proper vetting procedures:  The CRA shall have procedures in place to vet or qualify new public record researchers.  Records of such vetting may include:  1) evidence of right to conduct business, such as copy of business license, articles of incorporation, state filing etc., and authentication thereof; 2) verification of required private investigator license, if such license is required; 3) completed favorable reference interviews from at least one current client; 4) verification of association memberships such as local Chamber of Commerce, Better Business Bureau, NCISS, ASIS, etc.; 5) results of test searches conducted; and 6) confirmation of certification under the "Criminal Record Provider Guidelines."

Compliance with laws:  The CRA shall require public record researcher to certify in writing that they will conduct research in compliance with all applicable local, state and federal laws, as well as in the manner prescribed by the jurisdiction which maintains the official record of the court; never obtain information through illegal or unethical means; and utilize document disposal and/or destruction methods pursuant to the federal FCRA.

Quality assurance auditing:  The CRA shall maintain auditing procedures for quality assurance in regard to their active public record researchers.  Audit procedures for public record researchers may include, but are not limited to: 1) an established protocol for auditing researchers; 2) sending research requests where result is already known; 3) how returned results are compared to expected results; and 4) process for dealing with researcher errors up to and including termination of services.  It is recommended that test cases be entered in a log with results that may include: A) date of test; B) unique identifier such as order number or subject name plus last four digits of SSN; C) results returned; D) whether results were as expected; and E) any remedial actions taken.

BSAAP CRA Accreditation Standard with Audit Criteria, Standards 4.1, 4.2, 4.3, 4.6.

## V.      POLICIES AND PROCEDURES OF GIS FOR ACCURACY AND VENDOR OVERSIGHT.

### A.      Background

GIS is a nationally accredited background check company that has been providing background screening services since 1966.  GIS serves a wide variety of clients, from Fortune 500 and 100 companies to small organizations.  As part of its services, it provides consumer reports containing criminal history data to employers for use in employment decisions.

In conducting a criminal history background check, GIS employs both physical and electronic searches, using both in-house personnel and resources, as well as outside vendors with which it has contracted.

With respect to this case, GIS performed a background check on Plaintiff Thomas Black in response to a request from staffing company, Robert Half International, on or around February 2, 2015.  The report prepared by GIS included records of a proceeding from Cleveland Muni Court, Cuyahoga County, Ohio ("Cleveland Record").  The Cleveland Record indicates that Thomas Ricky Black was charged with the offense "ROBBERY" and that the level was "FELONY," and received "unspecified jail with 12 days credit for time served."  The disposition was reported as "GUILTY."  GIS-Black0000009.  The disposition is incorrect, as the case was bound over to the Cuyahoga Court of Common Pleas.  *See, e.g.*, WSS000006.

GIS obtained the Cleveland Record from Wholesale, one of its public records researchers.  The information Wholesale provided to GIS incorrectly listed the disposition as "GUILTY."  WSS000009.  When the Plaintiff disputed this record, GIS contacted Wholesale to investigate the correct status and the reason for the error.  WSS000003.  Wholesale determined that the researcher who reviewed the records from the Cleveland Muni Court made an error in interpreting the "confusing" docket, and that the record should have been reported to GIS as a non-conviction.  Deposition of Daniel L. Agee ("Agee") at 92; WSS000006, WSS000008.[17]

### B.      GIS's Procedures for Vendor Onboarding and Oversight of Public Records Researchers

GIS obtains records from over 3400 jurisdictions within the United States.  Deposition of Randy Strange ("Strange") at 24.  In order to obtain the records necessary to prepare the reports requested by its clients, GIS uses a number of different public records researchers. Strange at 18.  GIS has established a written procedure to vet or qualify new public records researchers. GIS-Black0000599.  According to John Hanks, GIS's Director of Public Records, this procedure aligns with the NAPBS accreditation standards on vetting public records researchers.

---

[17]     Contrary to Plaintiff's allegations in his complaint that "[n]o public record of Plaintiff's 2002 arrest existed at the time of the events pertinent to this action," Complaint at para. 26, the Cleveland Record was – and still is – available through the court's online system.  Deposition of Peggy Foley Jones ("Jones") at 43-44

The procedure requires that prior to onboarding a new public records researcher, GIS will obtain evidence to conduct business (such as a business license, articles of incorporation, and other state filings that have to do with evidence of conducting business).  GIS will check references by interviewing one or more of the researcher's current clients.  GIS also verifies any association memberships.  Finally, GIS conducts test searches in accordance with its "salting audit" procedures.

A salting audit is a process through which GIS sends research requests to the researcher (whether internal or external) to test the accuracy and turn-of-service by the researcher.  The research requests will consist of both known public record "hits" and known clear results.  The results returned by the researcher will be compared to the known results, and GIS will follow up on any discrepancies.  GIS requires that new public records researchers successfully pass the testing process prior to any work orders being assigned for fulfillment to the researcher.

GIS also requires that its public records researchers execute its independent contractor agreement prior to conducting test searches.  In addition, GIS trains its vendors and how to use its system to load and update the results of their research.  Larger vendors, such as Wholesale, use an XML integration into GIS's system.  For such vendors, GIS provides the appropriate XML schema with GIS's rules for each of the data elements.

With respect to ongoing oversight, GIS monitors the vendor's performance in a number of ways.  GIS leverages information from disputes and issues raised by clients, as well as the results of ongoing salting audits.  Once a week, GIS employees with compliance and vendor oversight responsibilities will meet to review any errors that are reflected on the error log, which includes errors identified through consumer disputes, salting audits, internal reviews, or issue brought to GIS's attention by its clients.[18]  This team reviews the log and reaches out to vendors to request that they recheck information and provide any reasons why there was a discrepancy.  Vendors are required to reply within three days.[19]  Vendors are also included in GIS's accuracy audit program, which was established in the summer of 2016.

Depending on the seriousness of the issues identified through the salting audits, the accuracy audits, consumer disputes, or otherwise, GIS may take a number of different actions, ranging from coaching the vendor, to suspension, reduction in the number of requests sent to the vendor, or, in appropriate circumstances, termination.  Hanks Interview.  GIS also may terminate a vendor as a result of its failure to respond to requests to research and explain errors.  Hanks Interview; Strange at 78-79.

---

[18]    The error review process has been in place at GIS for a number of years, but was formalized in March 2015 to establish a set weekly meeting.  Strange at 76-77, 80.

[19]    GIS recently expanded its salting audit process.  Historically, GIS salted a random selection of records for each vendor.  The new process ensures that GIS salts records for each vendor in every jurisdiction every three months.

Vendors typically are selected for their experience in particular jurisdictions.  Strange at 41-43; Hanks Interview.  Before requesting that an existing vendor add a new jurisdiction, GIS will test the vendor for response time and accuracy through the salting process.  Strange at 27. GIS also will interview the vendor to assess their familiarity with the jurisdiction and recording, including inquiring about the methods and means by which the researcher conducts research within the jurisdiction.  Hanks Interview.

### C.    GIS Procedures to Ensure Maximum Possible Accuracy and to Obtain Complete and Up to Date Public Records

GIS has established extensive written policies and implemented active procedures to ensure maximum possible accuracy of the consumer reports that it produces.[20]  The preparation of a background check containing a criminal history search consists of a number of steps designed to ensure accuracy.  For those criminal records that can be researched by GIS employees, GIS engages in extensive training in both a classroom and one-on-one setting on compliance with the FCRA and the methods for conducting criminal research.  Employees are trained in how to enter the data in the GIS system.  For vendors, GIS appropriately vets and oversees those vendors as described more fully above.

Prior to a report being delivered to an end user, GIS performs additional checks to ensure that the reports it delivers are accurate and otherwise comply with the FCRA and client requirements.  GIS utilizes criminal discrepancy software that compares previously created criminal history reports to new reports to detect if there is a significant difference between those reports with respect to the same jurisdiction.  If the software identifies a significant difference in the reporting from the same jurisdiction, the reports are directed to a queue for individual review by a GIS employee.  The employee reviews and compares the two reports, and conducts research to determine the cause for any differences.  Any errors are corrected before the subsequent report is provided to an end user.  In addition, errors identified through the reconciliation process are reviewed as part of the error-review and root-cause analysis process described below.

Once the criminal reconciliation process is completed, the report is sent to a Quality Assurance ("QA") team if it contains criminal records.  The QA process then reviews the results for, among other things, compliance with client guidelines (such as types of records to be

---

[20]    These written procedures include, but are not limited to, the following:  Standard Operating Procedure for Criminal Ordering (GIS-Black0000275, GIS-Black0000571, GIS-Black0000582); Criminal Discrepancy Reconciliation (GIS-Black0000600); Management Commitment on Compliance Management (GIS-Black0001956); Criminal Reporting SHORT GUIDE (GIS-Black0000586, GIS-Black0000589); Subject Public Records Entry Procedure (GIS-Black0000213, GIS-Black0000330); Quality Assurance Procedure (GIS-Black0000162); QA Review Process Procedures (GIS-Black0000163); County Criminal History Search (GIS-Black0000186); Reports Sent to QA After Completion (GIS-Black0000198).

returned).  The QA process also can identify errors or discrepancies, which would result in the report being returned for further research prior to delivery to the end user.

GIS also leverages the information that it obtains through its dispute process, as well as issues identified through its salting audits, criminal discrepancy process, and client-identified issues, to identify areas for improvement in its processes.  The process to review errors and escalate issues occurred informally within the company prior to March 2015, but GIS adopted a more formalized structure around this process in March 2015, including conducting a root cause analysis on every identified error.  Deposition of Ashley L. Hardister ("Hardister") at 47-50; Strange at 76-77, 80.  Because the nature of errors differs and errors can occur for a variety of reasons, and each error in turn could implicate different processes within the company, the error review process includes representatives from *every* group in operations.  Hardister at 170 (meeting includes "a vice president and a director and/or manager from every group in operations").

In the summer of 2016, GIS expanded its accuracy procedures by including an accuracy audit process involving a statistically significant sampling process.  Hardister at 134-35.

**VI.    EXPERT OPINIONS.**

**A.    GIS's oversight of its public records research vendors is consistent with industry standards and practices and otherwise reasonable based on my knowledge of the industry.**

Based on my review of the record, including my interview with John Hanks at GIS, it is my opinion that GIS's oversight of its public records research vendors, and in particular Wholesale, is consistent with industry standards and practices, consistent with the experience and understanding I obtained during my tenure at the FTC, and otherwise reasonable based on my knowledge of the industry.  Specifically, GIS's procedures are consistent with the accreditation standards established by NAPBS and are reasonably designed to ensure that GIS's vendors provide accurate, complete, and up-to-date information in response to GIS's requests.  Moreover, the record establishes that Wholesale, the particular vendor at issue in this case, has established commercially reasonable standards, and that the issue that occurred with respect to Plaintiff's February 2015 report was the result of an isolated human error and not due to the absence of oversight or training.

GIS brought Wholesale on as a vendor in 2008, after checking references and performing initial salting audits.  Hanks Interview.  In GIS's experience, Wholesale has proven to be an experienced and capable researcher.  *Id.* ███████████████████████ ██████████████████████████████and Wholesale has been able to meet its time service requirements with GIS.  Agee at 86-87.  Further, there have been no indications that Wholesale is unable to perform the services requested by GIS.  Hanks Interview.

The agreement executed by Wholesale and in place in February 2015 requires that Wholesale "use its best efforts to perform all services in a professional manner and to meet or exceed the highest standards in the industry."  WCC 000019-WCC 000024.  The agreement specifically requires that Wholesale "include all court records for felony and misdemeanor convictions," and "include any pending, dismissed, deferred, nonadjudicated, or not guilty cases."  *Id.*  Wholesale is required to conduct each search "in the county of request, at either the combined superior/state court, the superior/magistrate court" or "where the county does not offer a combined court, [Wholesale] Will conduct the search in the County of request, at the Superior Court and either the state court, the magistrate court, and/or the Municipal Court, where the applicable court is located within the same city as the Superior Court."  *Id.*  The agreement provides that "[a]ccurate court records on the subject, including without limitation, are required."  *Id.*  Further, the Agreement requires that Wholesale "comply with all applicable Federal, state and local laws and regulations and to obtain the documents and records only through lawful and proper means."  *Id.*

In addition to the specific contractual requirements, GIS ensures that Wholesale meets its obligations under the contract through salting audits and tracking error rates from disputes. Hanks Interview; Strange at 42-47.  Wholesale's performance under the contract has met GIS's requirements and expectations.  Hanks Interview.  As a result, GIS has expanded its use of Wholesale to other jurisdictions and uses Wholesale for overflow work as a backup to its internal researchers.  Hanks Interview.

GIS further requires Wholesale to provide it with information when errors are identified, whether through such audits, client inquiries, consumer disputes, or otherwise.  In the case of Mr. Black, GIS requested that Wholesale research the disputed record and provide specific details as to what happened to cause the reporting.  GIS also requested that Wholesale provide details for corrective action to ensure that the error would not reoccur.  The ultimate cause was determined to be human error.  Agee at 137-38.

Plaintiff's expert, Evan Hendricks, opines that GIS's oversight procedures were inadequate based on a single error made by a single researcher.  Mr. Hendricks asserts that GIS "failed to establish accuracy standards or monitoring or auditing standards," but he does not identify what such standards would be nor does his report acknowledge the requirement in the Wholesale contract that the records be accurate.[21]  Moreover, Mr. Hendricks ignores Wholesale's overall accuracy rate (around 99.95%).  Agee at 72.  Although he recognizes that Wholesale has certain training materials for Ohio criminal record research, he only focuses on

---

[21]    To my knowledge, there is no "industry standard" for accuracy, nor is one reflected in the NAPBS accreditation guidelines.  Further, GIS's contract requires that the records provided by its public records research vendors be "accurate," *see, e.g.*, WCC 000019-WCC 000024, and GIS's target for accuracy is "zero inaccuracy."  Deposition of Chris Lemens ("Lemens") at 158.

the online training implemented *after* the report produced in this case and ignores the one-on-one training that Wholesale provided to every researcher in each new jurisdiction.[22]  Agee at 106-08.

Mr. Hendricks does acknowledge that GIS engaged in salting audits, but claims that it is not enough, citing to a recommendation by GIS's outside vendor, Treliant.  He does not, however, know whether Treliant's recommendation was based on an industry standard or other requirement, nor can he cite to any evidence that GIS's oversight of Wholesale was insufficient – with the exception of the human error in this case.[23]

Further, Mr. Hendrick's opinion also overlooks the fact that, as a vendor that is required "to meet or exceed the highest standards in the industry," Wholesale conducts its own salting audits on its employees and outside researchers.  Wholesale had and has a policy of regularly salting the records for each of its researchers, and will engage in additional salting if it identifies a pattern of errors or other issues of concern.  Agee at 73-78.  Wholesale performs internal QA prior to delivering results to its clients.  Agee at 46-47.  Wholesale also addresses compliance issues as they are identified.  With respect to the particular issue identified as a result of Mr. Black's dispute, Wholesale counseled the researcher who made the error and put the researcher on a performance plan.  Agee at 113.  (The researcher was eventually terminated by Wholesale for failing to meet performance standards.)  Wholesale also engaged in additional training of other researchers assigned to the same jurisdiction using Mr. Black's specific case as a salting audit.  Agee at 111-12.[24]

GIS's reliance on experienced public records researchers to obtain relevant court records in the preparation of its consumer reports complies with industry standards and practice.  Further, GIS's selection and oversight of its public record research vendors, and in particular the vendor in this case, Wholesale, is consistent with industry standards and practices, and in particular the public records researcher standards established by NAPBS, and are otherwise reasonable based on my knowledge of the industry.

---

[22]  The training materials were part of a computer based training program that Wholesale purchased in mid-2015 to better standardize its employee training and to enable it to cross train employees on new jurisdictions more efficiently.

[23]  In his report, Mr. Hendricks implies that GIS has been slow to implement the Treliant recommendations.  What Mr. Hendricks fails to mention in his report, however, is that GIS's compliance plan to the CFPB was not approved, or rather, in CFPB parlance, did not receive a letter of non-objection, until September 2016.  Lemens at 22.  GIS employees testified that it is GIS's plan to increase the number of salting audits to the level recommended by Treliant.  Hardister at 146-47.  As of January 2017, GIS is salting every researcher in every jurisdiction on a three month rotation.

[24]  The record in this case establishes that Wholesale's process of researching records in Cleveland Municipal Court follows the same procedure used by Plaintiff's expert witness, Peggy Foley Jones.  Compare Agee at 94 with Jones at 44.

**B.  GIS's procedures to ensure maximum possible accuracy of its consumer reports that it provides to employers and that the public records information contained within such reports is complete and up to date are consistent with industry standards and practices and otherwise are reasonable based on my knowledge of the industry.**

In addition to its robust credentialing and oversight of public records researchers, GIS has established a number of procedures designed to ensure that its reports achieve "maximum possible accuracy" and to ensure that the public records information contained within such reports is complete and up to date.  See procedures described above at pp. 11-12.  In my opinion, and based on my knowledge of the industry through my tenure at the FTC and in working with companies both as external and internal counsel, GIS's procedures are consistent with (or exceed) industry standards and practices and are otherwise reasonable.  GIS employs a number of different strategies to ensure the accuracy of its reports and to ensure that the public records information contained within its reports is complete and up to date, starting with appropriate training for its employees, careful vendor selection and oversight, and automated and hands-on processes to obtain complete and up to date records and review reports prior to their delivery to an end user.

In his report, Mr. Hendricks cites to one of GIS's procedures – the criminal discrepancy process – as evidence that GIS has a "systemic inaccuracy problem."  Hendricks Report at 5. Mr. Hendricks, however, fails to understand the role that the criminal discrepancy process plays as part of GIS's procedures to ensure maximum possible accuracy. GIS utilizes the criminal discrepancy process to flag and identify errors during its preparation of reports, prior to any information being delivered to an end user. The responsibility to ensure maximum possible accuracy is triggered when a consumer reporting agency delivers a consumer report to an end user, not before. The discrepancies that are identified through the criminal discrepancy process are not proof of an accuracy problem; rather, they are proof that the criminal discrepancy process plays an important and useful role in ensuring maximum possible accuracy of reports ultimately provided to clients.

Further, in a number of places in his report, Mr. Hendricks asserts that GIS had "no formal process" for conducting root cause analysis and reviewing errors within the 2014-2015 time frame, although he acknowledges that GIS had a number of processes and procedures to identify and address errors and issues that its employees identified. Hendricks Report at 6-7. However, Mr. Hendricks does not cite to any systemic accuracy issues that resulted from the fact that GIS's historical procedures were more decentralized. Further, in my experience, good compliance management involves ongoing review and improvement of a company's processes to address its compliance responsibilities.  The compliance changes that GIS has adopted are

not evidence of any prior failures on the part of GIS, but are reasonably expected of a responsible, growing company like GIS.[25]

**VII.    CONCLUSION.**

In my opinion, GIS's oversight of its public records research vendors, including Wholesale, is consistent with industry standards and practices and otherwise reasonable based on my knowledge of the industry.  Further, GIS's procedures to ensure maximum possible accuracy in the consumer reports it provides to employers and that the public records information contained within such reports is complete and up to date are consistent with industry standards and practices and otherwise are reasonable based on my knowledge of the industry.

_____

Rebecca E. Kuehn


July 21, 2017

_____

[25]    As GIS has acknowledged, a number of changes that GIS is adopting are the result of its agreement with the CFPB to resolve CFPB's investigation of GIS.  However, the fact that GIS chose to resolve CFPB investigation through an agreed consent order is not proof that GIS's existing procedures were deficient.  In my experience as an enforcement attorney at the FTC, and in representing private parties subject to investigation by the FTC and CFPB, a company may choose to resolve a government investigation for a number of reasons, none of which may relate to the merits (or lack thereof) of the government's case. Notably, in the context of the consent order, GIS and its affiliate company consented to the issuance of the consent order "without admitting or denying any of the findings of fact or conclusions of law" with the exception of the jurisdictional allegations.  Consent Order at II.

**EXHIBIT A**

**Exhibit A to Expert Report of Rebecca Kuehn**

**Materials Considered and/or Relied Upon**

<u>Documents Received from GIS</u>

1.  Complaint in *Black v. General Information Solutions LLC*, No. 1:15-CV-01731-DCN (N.D. Ohio)

2.  Protective Order (and acknowledgment) in *Black v. General Information Solutions LLC*, No. 1:15-CV-01731-DCN (N.D. Ohio)

3.  GIS's responses to all of Plaintiff's interrogatories, including all supplements

4.  GIS's responses and objections to Plaintiff's Rule 30(b)(6) deposition notice

5.  Deposition transcripts of:  (1) Daniel L. Agee; (2) Randy Strange; (3) Jamie F. Pelchat; (4) Ashley L. Hardister; (5) Chris Lemens; (6) Evan Hendricks; and (7) Peggy Foley Jones, with all exhibits to all of the foregoing

6.  Documents produced by GIS:  GIS-Black0000001 – GIS-Black0003565 and native files therein

7.  Documents produced by Thomas Black:  BLACK0000001 – BLACK0000120

8.  Documents produced by Treliant:  TRA_000001 – TRA_015715 and native files therein

9.  Documents produced by Second Order Solutions (no Bates numbering)

10. Documents produced by Wholesale:  WCC 000001 – WCC 000256 & WSS000001 – WSS000071.

11. Expert report of Evan Hendricks, with exhibits

12. Expert report of Peggy Foley Jones, with exhibits

<u>Other</u>

Interview with John Hanks on July 7, 2017

Online review of record on Thomas R. Black, 2002 CRA 044445, State of Ohio/City of Cleveland vs. Black, Thomas R., accessed July 20, 2017 (available at https://eservices.cmcoh.org/eservices/search.page.3?x=P1c-v7Dr*Yd1CvC9XpP2XJYrHd2HQJJLHKym8OiP0TYSQRdHoH-wiaaN*vq1E-d4g5E5Ainpop99sVFSzqJTww)

The World Bank, *General Principles for Credit Reporting*, September 2011

Federal Trade Commission, *40 Years of Experience with the Fair Credit Reporting Act:  An FTC Staff Report with Summary of Interpretations*, July 2011

National Association of Professional Background Screeners Accreditation Criteria

All additional and/or other materials cited and/or referenced in my Report, including statutes, regulations, government publications, and websites.

**EXHIBIT B**

**Exhibit B to Expert Report of Rebecca Kuehn**

<u>**Publications Authored by Rebecca Kuehn**</u>

Kuehn, Rebecca, and Denson, Allen H.; *Important Rules of the Road for BHPH Dealers who Furnish Information to Credit Bureaus*; Spot Delivery, September 2015

Kuehn, Rebecca, and Musselman, Meghan S., *Third Circuit Thwarts Challenge to FTC's Data Security Authority*, Spot Delivery, September 2015

Kuehn, Rebecca, and Zaman, Latif, *New York Court of Appeals to Consider Scope of Law Prohibiting Discrimination Based on a Criminal Conviction*, Hudson Cook Insights, January 2017

**EXHIBIT C**

**Rebecca E. Kuehn**

Hudson Cook, LLP
1909 K Street, N.W., 4th Floor
Washington, DC  20006
202-715-2008
rkuehn@hudco.com

*Professional Profile*

Experienced consumer financial services attorney with significant privacy expertise.

*Work Experience*

**Hudson Cook, LLP**, Washington, D.C.
Partner, April 2015 to Present

Practice focuses on consumer financial services and consumer protection matters. Counsels financial institutions, consumer reporting agencies, service providers, and others in complying with consumer financial laws and prohibitions against unfair, deceptive, or abusive trade practices. Represents clients before federal and state agencies and the courts, particularly the Federal Trade Commission and Consumer Financial Protection Bureau, in investigations and other proceedings.

**CoreLogic**, McLean, VA
Vice President and Senior Regulatory Counsel, September 2011 to April 2015

Served as lead lawyer and coverage counsel for the CoreLogic credit reporting and consumer data businesses, providing advice and guidance to management on a variety of consumer data and privacy-related regulatory issues, including the Fair Credit Reporting Act (FCRA) and the Gramm-Leach-Bliley Act.

**Federal Trade Commission**, Bureau of Consumer Protection, Washington, D.C.
Assistant Director, Division of Privacy and Identity Protection, May 2006 to September 2011

Supervised attorneys and other staff on investigations and policy work related to credit reporting, consumer privacy, identity theft, and information security.  Primarily responsible for the Fair Credit Reporting Act program, leading the Commission's enforcement, policy, outreach, and rulemaking activities in that area.  Regularly coordinated with the federal financial agencies in the development, issuance, and interpretation of interagency rules, including the Affiliate Marketing Rule, the Risk Based Pricing Rule, the Accuracy and Direct Dispute Rules, and the amendments to Gramm-Leach-Bliley Privacy Rule.

Responsibilities included analyzing and providing comment on legislative proposals to senior Commission staff and Congressional staff, coordinating legal interpretations and policy across intra- and interagency boundaries, and serving as a subject matter expert and resource to Commission staff and industry.  Provided technical assistance to Egypt on oversight and regulation of credit bureaus as part of USAID mission.  Served on the World Bank Credit Reporting Task Force, providing significant contributions to the development of a consultative draft report entitled General Principles for Credit Reporting.

**LeClair Ryan**, Alexandria, VA
Partner, January 2002 to May 2006
Associate, February 2000 to December 2001

Developed litigation and counseling practice concentrated on the representation of financial service providers and consumer reporting agencies, including claims brought under state law, the Fair Credit Reporting Act, the Truth in Lending Act, and the Fair Debt Collection Practices Act.  Significant first-chair trial experience.  Responsible for the supervision of junior attorneys and the management of case assignments for office.

**Reed Smith Hazel & Thomas LLP**, Falls Church, VA
Associate, January 1997 to February 2000

Primarily responsible for a variety of civil litigation matters, including commercial matters, software and other technology-related disputes, lender liability, medical malpractice defense, and products liability actions.

**Spriggs & Hollingsworth**, Washington, D.C.
Associate, September 1994 to January 1997

Litigation practice, primarily focused on commercial matters, multi-party toxic tort actions, and insurance coverage disputes.

## *Bar Contributions*

Chair, 2016 National Institute for Consumer Financial Services Basics, American Bar Association, Section of Business, Consumer Financial Services Committee

Contributor, CFPB Biweekly Updates, American Bar Association, Section of Antitrust, Consumer Protection Committee, 2015 to Present

Faculty, National Institute for Consumer Financial Services Basics, 2013, 2014, 2015, 2016

Observer, Criminal Records Accuracy Committee, Uniform Law Commission, 2015 – Present

Member, American Bar Association, Section of Litigation, Woman Advocate Committee

## *Education*

**The George Washington University, National Law Center, Washington, D.C.**
Juris Doctor with High Honors, May 1994
Class Rank:  Top 5%
Member, The Order of the Coif
Member, *The George Washington Law Review*
Anne Wells Branscomb Award for Graduating Student with Highest Average
 in Part-Time Course of Study

**Frostburg State University, Frostburg, MD**
Bachelor of Arts, Magna Cum Laude, December 1988
English Major with Business Minor
Commencement Speaker for Graduating Class

## *Bar Admissions*

Admitted to practice in Maryland, Virginia, and the District of Columbia

## *Selected Presentations*

*Tenant Screening Basics,* National Association of Professional Background Screeners Annual Conference, September 2016

*Class Actions After Spokeo, Inc. v. Robins*, ABA Section of Business Law Annual Meeting, September 2016

*Privacy Law Developments – Emerging Data Trends, Privacy Law Developments – Employment, Privacy Law Update,* Counselor Library Conference 2016, April 2016

*The Automobile as the Ultimate Mobility Device – Autonomous, Connected, Electric Shared*, FICO World 2016 Conference, April 2016

*Simplified Compliance Management for Screening Companies*, National Association of Professional Background Screeners Annual Conference, September. 2015

*Fair Credit Reporting Act:  Litigation, Regulatory and Enforcement Developments in the Financial Services Industry and Beyond*, Stafford Conferences Webinar, June 2015

*Big Data and Global Privacy*, FICO World Conference, November 2014

*Fair Credit Reporting Act and Financial Privacy*, ABA National Institute on Consumer Financial Law Basics, October 2014

*Alternative Credit Data*, Credit Builders Alliance Credit Building Symposium, July 2014

*CFPB and Furnisher FCRA Obligations*, ABA Consumer Financial Services Committee Winter Meeting, January 2014

*Background Screening:  Is FCRA Compliance Enough or Does the FTC Want More?*, International Association of Privacy Professionals, December 2013

*Top 10 Compliance Challenges for CRAs*, National Association of Professional Background Screeners Annual Conference, September 2013

*International Credit Reporting and Alternative Data*, NCLC/Suffolk Law School, Credit Reporting and Credit Scoring Symposium, June 2012

*Update by the Federal Trade Commission*, 2011 National Association of Professional Background Screeners Annual Conference, March 22, 2011

*Update on the FTC*, 2010 National Credit Reporting Association Annual Conference, November 11, 2010

*Federal FCRA* and *FTC Enforcement Initiatives*, 24th Annual Payment Card Institute, May 6-7, 2010

*The Inside Straight on the Changing Government Role in the Economy*, ACA International's 70th Annual Convention, July 14, 2009

*Implementation of the Affiliate Sharing Rule and Red Flags Rule*, American Bar Association Consumer Financial Services Committee, 2008 Winter Meeting, January 11, 2009

*The FCRA:  It's Not Just for Credit Bureaus*, IAPP Privacy Academy, Sept. 23, 2008

*Identity Theft and Privacy Rules*, 2008 NACCA Examiner's School, May 8, 2008

*Security Freezes and the Impact on the Credit Reporting System*, Fair Isaac's 2007 InterACT Conference, San Francisco, CA, May 15, 2007

*Data Security and Recommendations of the President's Identity Theft Task Force*, Collection and Recovery Solutions 2007 Conference, Las Vegas, NV, May 3, 2007

*Recent Developments in Data Security*, American Financial Services Association, Law Committee Meeting, January 29, 2007

*Current Topics in Credit Reporting and Credit Scoring*, American Financial Services Association, 8th Annual State Government Affairs Forum, September 28, 2006